UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:06CV-75-H

ROBERT LEWIS BAAR                                          PLAINTIFF

V.

JEFFERSON COUNTY PUBLIC SCHOOLS, et al.                    DEFENDANTS


**MEMORANDUM OPINION**


Plaintiff, Robert Lewis Baar, is a teacher with the Jefferson County Public Schools. Defendants are the Jefferson County Board of Education ("the JCPS"), Stephen W. Daeschner, Carolyn Meredith, Melissa Payne, Marsha Dohn, Minor Daniels, and Jim Jury (collectively referred to herein as "Defendants"). Plaintiff has alleged violations of his First, Fourth, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 and § 1985 arising out of a series of disciplinary actions that JCPS took against him.  Though Defendants have now moved for summary judgment, many of the contested issue are matters of law and fact for the Court to decide.

Plaintiff's deep dissatisfaction with the discipline undertaken against him is both genuine and understandable.  It is worth remarking at the outset, however, that this Court's role is not to review the correctness of specific union contract interpretations or school disciplinary decisions. Rather, the Court's job is to determine whether the discipline that JCPS imposed violates Plaintiff's First Amendment rights of association or speech.  The Court is very familiar with this

1

case, having reviewed the memoranda and having discussed those issues for almost two hours with counsel.   Whether a constitutional claim can be fashioned from its various threads is a matter for the Court to determine.

I.

The unusual and extensive circumstances preceding this lawsuit are a necessary backdrop for the larger constitutional analysis.

Plaintiff has been a teacher in the Jefferson County schools since 1985.  In 1992, Plaintiff played a major role in founding the Louisville Area Chemistry Alliance ("LACA"). Superintendent Daeschner had the idea of starting alliances to improve and stabilize science in the public schools. (Pl.'s Dep. 20). Defendants' counsel describes LACA as "an independent group of science teachers from private schools, public schools, parochial schools, that get together and talk about science issues and have professional development." (Transcript of Oral Arguments of Oct. 23, 2006 at 28).  LACA meetings are open to any science teacher, not just those designated by a school as its representative.  During discussions with the Court, Plaintiff explained that LACA discusses topics including textbooks, curriculum, and procedures for ensuring student safety in the lab.  It receives federal, state, and local funds.  Plaintiff was active in LACA from its inception until sometime around 2001, when he voluntarily stopped attending. (Pl.'s Dep. 127).

In February 2002, Plaintiff, who was then teaching at Jeffersontown High School, sent a two-page letter to another teacher, Melissa Payne ("Payne").  Payne perceived the letter as a threat to her and her family.  She brought her concerns to the attention of the school's principal,

Marsha Dohn ("Dohn").[1]  Dohn, in turn, notified the Director of Employee Relations, Carolyn

Meredith ("Meredith").  On February 8, 2002, Payne, Dohn, and Minor Daniels ("Daniels"), the

JCPS Executive Director of business affairs, met with Plaintiff.  During the meeting, all the

parties entered into a Memorandum of Understanding (the "2002 Memorandum") which states:

> On this day, February 8, 2002, Mr. Robert Baar agrees to
> discontinue communication in any form, verbal or written
> with Missy Payne.  If there is need for communication
> concerning professional matters, Mr. Baar or Ms. Payne will
> contact the principal, Ms. Marsha Dohn, and Ms. Dohn will
> mediate the transaction.

Plaintiff claims that he was forced to sign the 2002 Memorandum "under threat of being fired."

During the investigation that followed, Plaintiff was temporarily reassigned from normal

teaching duties.

On June 5, 2002, Dohn issued a written reprimand arising from the "inappropriate

communications with a coworker" in February. ("the 2002 Reprimand").  The 2002 Reprimand

stated, "You are to have no further contact with Ms. Payne or her family and she is to have no

further contact with you or your family."  It also informed Plaintiff that he would be transferred

to another location.  Plaintiff was ultimately transferred to Ballard High School, where he

teaches today.

While all of this was transpiring, Plaintiff filed a grievance against Dohn under the terms

of the Jefferson County Teachers' Association ("the JCTA") collective bargaining agreement

("CBA").  The JCTA represented him in the grievance process. On October 17, 2003, Meredith

---

[1]The letter stated that Payne's family faced "significant risk" and increasing "danger." Plaintiff strongly
objects to the characterization of the letter as "threatening."  Because Plaintiff's claims arising from the events in
2002 are barred by the statute of limitations, Plaintiff's actual intent, and Defendants' actions in disciplining Plaintiff
as a result of the letter are not before the Court.

and Stephen Neal, the JCTA representative, settled the grievance by executing a Grievance Resolution (the "2003 Resolution").  Oddly, Plaintiff was not a party to the settlement.  The 2003 Resolution removed the 2002 Reprimand from Plaintiff's personnel file and left the 2001-2002 payroll records unchanged.  It states, "Grievance number T02-065-25-01 and any and all claims made or which could have been made by the grievant related to the subject of this grievance are hereby resolved/settled."  It concludes, "This settlement is the complete resolution of all issues related to the subject of this grievance and JCTA will not support any other grievance concerning this issue." The 2003 Resolution does not mention the 2002 Memorandum.

Apparently, all was well for some two years.  Then, in the fall of 2005, Plaintiff responded to a notice of a regular LACA meeting via an e-mail to Payne stating, "Count me in for the LACA meeting on the 29th.  I will bring the money for the dues to the meeting.  Bob." This seemingly innocent response struck an entirely different tone for Payne.  She complained about the direct contact, prompting Meredith to order another investigation. Plaintiff explained that Payne was listed as the contact person and that his e-mail was in response to "the school administration directing him who to contact regarding attendance at the up-coming meeting." The JCTA took the position that the investigation itself violated the 2003 Resolution which, in the JCTA's view, had terminated the 2002 Memorandum.  Nonetheless, the investigation continued.

On December 14, 2005, Plaintiff's current principal at Ballard High School, Dr. Jim Jury ("Jury"), issued a formal reprimand (the "2005 Reprimand") against Plaintiff for violating the 2002 Memorandum prohibition against contact with Payne.  The 2005 Reprimand directed Plaintiff to abide by the 2002 Memorandum and, "while an employee of the Jefferson County

School System, you are not to represent Ballard or the Jefferson County Public Schools at any science alliance[2] meeting, effective immediately." Plaintiff says that he did not pursue a grievance because the JCTA would not support any other appeals. He was particularly concerned with the ban on his participation in LACA because, as founder of the organization, he perceives great benefits in continued participation, including enhanced professional development, and maintaining his status and reputation among his fellow science teachers.

In conjunction with the investigation and issuance of the reprimand, Meredith notified the Educational Professional Standards Board ("the EPSB"), the statutory public entity responsible for maintaining teaching certification standards of the investigation and forwarded a copy of the reprimand. The EPSB routinely dismissed the proceeding against Plaintiff, and did not revoke his teaching certification. Plaintiff says that shortly after Jury issued the 2005 Reprimand, Payne "attempted to interfere" with Plaintiff's duties as a judge in a January 2006 Quick Recall Match.

Plaintiff brings his claims under 42 U.S.C. § 1983,[3] claiming violation of his rights under the First, Fourth, Fifth, Seventh, and Fourteenth Amendments.[4] Specifically, Plaintiff identifies

---

[2]From the parties' pleadings, the Court understands the term "science alliance" to include the Biology Alliance, the Chemistry Alliance, and the Physics Alliance. In this opinion, the Court uses the terms "Chemistry Alliance", "LACA", and "science alliance" interchangeably.

[3]Plaintiff also brings a claim under §1985, which provides a right of action to persons claiming conspiracies to deprive them of rights, privileges, or immunities secured by the Constitution or federal law because of a conspiracy. Here, Plaintiff's §1985 conspiracy claims are barred as a matter of law since all Defendants are employees of JCPS. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991)(affirming the district court's dismissal of a §1985(3) where, as employees or agents, a school district superintendent, the executive director of the district, and a school administrator were members of the same collective entity and were therefore not "two separate 'people' to form a conspiracy.").

[4]Plaintiff also claims a Seventh Amendment violation. The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trail by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of common law." Here, where the Court finds no issues of disputed material facts, summary judgment does not

these rights as: 1) the right to due process of law; 2) property interest; 3) liberty interest; 4) First Amendment rights; 5) protected contractual rights;[5] 6) privacy rights. (Pl.'s Mem. of Law Pursuant to Order of Ct. I).  Plaintiff's remaining claims allege due process violations arising from the 2005 Reprimand, the letters Meredith sent to the Educational Professional Standards Board informing them of the 2005 investigation and Reprimand, Payne's alleged interference with Plaintiff's participation as a judge at a 2006 Quick Recall match, and First Amendment violations relating to the 2005 Reprimand and the prohibition on his attendance at LACA meetings or communication with Payne.[6]  Plaintiff seeks nullification of the reprimand and restrictions contained in the 2005 Reprimand, assurance that he will not lose his Kentucky Teacher Certificate,  recovery of his economic losses, and punitive damages.

---

infringe on Plaintiff's Seventh Amendment rights.  *See Leary v. Daeschner*, 349 F.3d 888, 910 (6th Cir. 2003)(hereinafter "*Leary II*")( "If there are no issues for a jury, it is not error for the district court to dismiss the Plaintiff's claims pursuant to a summary judgment motion, thereby implicitly denying their demand and motion for a jury trial.").

[5]Plaintiff has not pled a claim for breach of contract under state law.  Therefore, the Court considers the alleged contractual violations only as they relate to Plaintiff's stated constitutional claims.

[6]During argument of the summary judgment, Plaintiff also claimed that the female JCPS employees conspired against him due to his gender and slandered him by their statements and actions.  Plaintiff later filed a "Notice to the Court and All Parties-Defendants" where he claimed that his complaint contained "a claim of the State-recognized common law cause of action of the defamation of Plaintiff by the Defendant Payne."

The Court has carefully reviewed Plaintiff's Second Amended Complaint.  In Count IV of the Second Amended Complaint, the recitation of the facts supporting the First, Fifth, and Fourteenth Amendment constitutional claims does state, "Beginning February 7, 2002, Defendant Payne falsely and maliciously and with intent to defame Plaintiff personally and damage his professional standing and advancement, initiated a totally unfounded complaint against Plaintiff by sharing with Defendant Principal Dohn a two-page letter from Plaintiff that was then incorrectly misinterpreted as threatening."  Even if properly pled, such a claim would be barred by the statute of limitations, as discussed below.

Count IV, ¶ 8 describes Plaintiff's causes of actions arising under the Constitution: "By reason of the foregoing Payne violated Plaintiff's rights under the First, Fifth and Fourteenth Amendments, for which there is no adequate remedy at State law."  It does not purport to assert a state law defamation claim nor does it allege specific comments which could support such a claim.  The "Introduction" to the Second Amended Complaint confirms this view.  It states, "This is a suit brought for the deprivation of Plaintiff's Federally-protected Constitutional rights under the First, Fourth, Fifth, Seventh and Fourteenth Amendments of the Constitution of the United States."  Accordingly, the Court finds that this language simply does not plead a state law defamation claim.

Upon completion of discovery, Defendants moved for summary judgment under Fed. R. Civ. P. 56. The Court should grant such a motion if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)(citing Fed.R.Civ.P. 56(c)). In applying Rule 56(c)), a court views the evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court properly enters summary judgment where there is not sufficient evidence in support of the non-movant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

## II.

As a preliminary matter, the Court must address Plaintiff's request for reconsideration of an Order dated October 25, 2006, which dismissed on statute of limitations grounds Plaintiff's claims that arose prior to February 9, 2005.  As before, Plaintiff relies on the continuing violation doctrine to support his argument that he may recover for claims filed outside the one-year statutory period applicable to § 1983 claims.  In its Memorandum Opinion accompanying the Order of October 25, 2006, this Court considered and rejected the applicability of the continuing violation doctrine to Plaintiff's claims, noting that "in our case, Plaintiff alleges neither an overarching discriminatory intent nor a discriminatory policy. Instead, he alleges numerous individual acts which amount to separate types of constitutional violations." (Mem. Op. Oct. 25, 2006).

In some cases, courts have been willing to apply the continuing violation doctrine where a plaintiff shows that Defendants' actions were not isolated incidents, but instead exemplify a

7

pattern of discriminatory working conditions.  *See Hull*, 926 F.2d at 511 (rejecting the argument

that a plaintiff must prove that the series of acts are "part of one ongoing plan or scheme" and

stating that a court "should determine what event should have alerted the average lay person to

protect her rights.")(internal citations omitted).  Plaintiff's claims, however, are distinguishable

from cases where courts have applied the continuing violation doctrine.  Plaintiff does not claim

a series of discriminatory actions based on his race, gender, or national origin as in the Title VII

cases he cited. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)(Title VII claim

alleging origin on the basis of race); *Morgan  Brown v. Hurtshorne Pub. Sch. Dist. No. 1*, 926

F.2d 959, 962 (10th Cir. 1991)(Title VII claim alleging discrimination on basis of national

origin).  Although all his claims may ultimately be traceable to his 2002 correspondence with

Payne, the common facts tying them together do not amount to a continuing violation.  Rather, as

the Sixth Circuit recently reiterated, "[a] continuing violation is occasioned by continual

unlawful acts, not continual ill effects from an original violation." *Dixon v. Clem*, 492 F.3d 665,

672 (6th Cir. 2007)(quoting *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir.

1999)).

    For these reasons, the Court declines Plaintiff's request to consider his claims which

arose from events occurring prior to 2005.

III.

    Plaintiff first claims due process violations under the Fifth and Fourteenth Amendments.

Contrary to Defendants' argument, there is no requirement that a plaintiff exhaust available

8

administrative remedies prior to bringing a §1983 claim.  *Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 588 (6th Cir. 2004)(". . . one need not exhaust state remedies before bringing a Section 1983 action claiming a violation of procedural due process . . .").  Notwithstanding this conclusion, and as a threshold matter, the Court must analyze the CBA, including the adequacy of its grievance procedures to determine, "whether the plaintiff has a property interest entitled to due process protection." *Mitchell v. Frankhauser*, 375 F.3d 477, 480 (6th Cir. 2004)(citing *Leary v. Daeschner*, 228 F.3d 729, 741-41 (6th Cir. 2000)(hereinafter "*Leary I*"). The Sixth Circuit has recognized that one may have a property right in certain terms of a collective bargaining agreement. *Leary I*, 228 F.3d 729.  "Second, if the plaintiff has such a protected property interest, 'this court must then determine what process is due.'" *Mitchell*, 375 F.3d at 480.  For the reasons that follow, the Court concludes that our facts cannot support these constitutional claims.

A.

   After thorough review of Plaintiff's pleadings, the Court does find three potential property interests related to the 2005 Reprimand.

   The first is Plaintiff's claim to approximately $5,000 in annual income that he earned "by planning and directing various professional development courses."  (Pl.'s Injuries and Damages Cognizable under §1983 Exh. A).   Plaintiff does have a property right in his continued employment as a public school employee. *See, e.g. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).  However, state contract law determines whether Plaintiff has any constitutionally protected property interest in additional income in other capacities.  *Id.*  Plaintiff identifies no contractually-based entitlement to such extra-curricular employment.  This is not

9

surprising.  Accordingly, the Court will not recognize a constitutional property interest in the lost income from extra-curricular employment or non-contractual professional development opportunities.

Second, Plaintiff says that the 2005 Reprimand itself violated due process.   As the Supreme Court has explained, the "hallmark of property" is "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). The CBA does provide that "an employee . . .may not be adversely evaluated without just cause."  The Court must examine whether the procedures accompanying the negative evaluation provided due process.  Here, the Court concludes they did.

Defendants conducted an investigation and met with Plaintiff and his representative. Defendants concluded that the 2002 Memorandum was still in effect, and that Plaintiff's e-mail to Payne violated it.  The process available for Plaintiff did not end there.  The CBA provides detailed grievance procedures for resolving a "complaint that there has been a violation, misinterpretation or improper application of one or more specific provisions of this Agreement or any complaint alleging improper, arbitrary, or discriminatory conduct." Article 29, Section A. These procedures include an opportunity for a written decision following a hearing with the Superintendent/designee.

Plaintiff contends that the 2003 Resolution prevented the teacher's union from representing him in such a grievance and that the union "told me they wouldn't write [the grievance . . . and that a grievance] takes a signature of the [union] rep." (Transcript of Oral Arguments of Oct. 23, 2006 12-13.[7]  The Court cannot reconcile this purported statement with

---

[7]Elsewhere, however, Plaintiff admits, "the union said, we will take the reprimand in paper, but we can guarantee you you will lose it at every level." (Transcript of Oral Arguments of Oct. 23, 2006 12.).

the terms of the grievance procedures contained in Article 29 of the CBA, which do not preclude him from using those procedures without the assistance of his union.[8]  More importantly, the procedures allow a union member to file a grievance and to appeal through several levels should his grievance be denied or dismissed.  The Court concludes, therefore, that the existing written grievance procedures satisfy due process.  Such a conclusion should not be surprising given the extensive  pre- and post-deprivation procedures that the JCTA negotiated into the CBA.  *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)( "Due process is flexible and calls for such

---

[8]For example, Article 29, Section B, (2) states:

> Nothing contained herein will be constructed as limiting the right of any employee having a grievance to discuss the matter informally with a grievance to discuss the matter informally with any appropriate member of the administration, *and to have the grievance adjusted without intervention by the Association, provided that the adjustment is not inconsistent with the terms of this Agreement and that the Association after Level I has been given an opportunity to be present at such adjustment and to state its views.* (emphasis added)

This language indicates that a grievant is free to proceed with or without union assistance.  Although Section H states, "the Association shall have the responsibility for appropriate distribution of the forms for filing grievances," this does not mean it has authority to withhold the form necessary to initiate a grievance.

Finally, the Court considers the procedures for a "Level III" grievance:

> If the grievant is not satisfied with the disposition of the grievance at Level II, or if no written decision has been rendered within twelve (12) days after the grievance has been submitted at Level II the Association *may submit the grievance to arbitration.* The Association shall notify the Superintendent/designee within twenty five (25) days.  If a question as to the arbitrability of an issue is raised by either party, such question shall be determined in the first instance by the arbitrator.

Article 29, Section D (emphasis added).

The permissive language emphasized above indicates that the Association may have some discretion in determining which claims proceed to arbitration.  But even if Plaintiff could not proceed to arbitration without union representation, the Court's conclusion that the grievance procedures satisfy due process is unchanged. This is so because it is not Defendants who are depriving Plaintiff of this process, rather it is the unwillingness or inability (due to the agreement in the 2003 Grievance Resolution) of the union to proceed further with the grievance.

procedural protections as the particular situation demands.").[9]

Finally, Plaintiff also identifies his "contractual duty as a [Quick Recall] judge" as a property interest. (Pl.'s Mem. of Law Pursuant to Order of the Ct. 10).  He says that Payne's attempt "to interfere, through the tournament director, with Plaintiff's duties as a judge in a Quick Recall match" deprived him of this interest.  Even if Plaintiff had a contractual right to be a Quick Recall judge, Payne's attempted interference at a particular match does not amount to a due process violation.  If anyone, the tournament director determined to limit Plaintiff's role in a particular match.  If Plaintiff was dissatisfied with this action, the grievance procedures provide adequate process.[10]

B.

Plaintiff also claims that Defendants deprived him of protected liberty interests including damage to his professional reputation, loss of status and respect among his peers and students, loss of professional development opportunities, as well as his ability to get a new teaching position elsewhere. Harm to reputation can implicate a protected liberty interest, but the harm must be accompanied by the deprivation of some more "tangible interest" "such as employment." *Paul v. Davis*, 424 U.S. 693, 701 (1976).  "A plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance,

---

[9]The same analysis applies to Plaintiff's claim that Defendants violated various sections of the CBA. Plaintiff has not stated a breach of contract claim and the grievance procedures provide a constitutionally adequate process for Plaintiff to challenge those alleged violations.

[10]Plaintiff directs the Court's attention to *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794 (7th Cir. 2000) for support of his argument that he has a property right to attend meetings and professional development activities.  Again, even if his "ability to teach, speak and perform and advance as a science teacher" has been harmed, the grievance procedures provide adequate due process to address his contractual concerns.

12

incompetence, neglect of duty or malfeasance." *Ludwig v. Bd. of Trustees of Ferris State*, 123

F.3d 404, 410 (6th Cir. 1997). "A charge that merely makes a plaintiff less attractive to other

employers but leaves open a definite range of opportunity does not constitute a liberty

deprivation." *Id.* (citing *Chilingirian v. Boris*, 882 F.2d 200, 205-06 n.8 (6th Cir. 1989)).  A

plaintiff must also allege that the stigmatizing information was publicly disclosed. *Joelson v.*

*U.S.*, 86 F.3d 1413, 1420 (6th Cir. 1996)(citing *Christian v. Belcher*, 888 F.2d 410, 416 (6th Cir.

1989)).[11]

Here, the 2005 Reprimand did not result in Plaintiff's termination.  Nor did Defendants

disclose the 2005 Reprimand, beyond the disclosures to the EPSB required by state law.[12]

Whatever detriment the 2005 Reprimand, or the report to the EPSB caused, it resulted solely

from an official sanction which Plaintiff never challenged in a subsequent proceeding.

Therefore, one cannot conclude that Defendants denied him due process.

C.

---

[11]Plaintiff directs the Court's attention to *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) which states that a "a substantive due process right may be implicated when a public employee is discharged for reasons that shock the conscience." Under *Perry*, the First Amendment qualifies as a fundamental right for purposes of stating a due process claim. 209 F.3d at 608.  On the other hand, claims to rights of professional development, status, or reputation alone are not among those "fundamental liberty rights" giving rise to a substantive due process claim. *See, e.g.* *Chavez v. Martinez*, 538 U.S. 760 (2003)(noting the Supreme Court's "oft-stated reluctance to expand the doctrine of substantive due process.").

[12]In relevant part, Ky. Rev. Stat. Ann. § 161.120(2)(a) states:

The superintendent of each local school district shall report in writing to the Education Professional Standards Board the name . . .of any certified school employee . . .who otherwise may have engaged in any actions or conduct while employed in the school district that might reasonably be expected to warrant consideration for action against the certificate under subsection (1) of this section.

Among the reasons listed in 161.120(1) is "Receiving disciplinary action or having the issuance of a certificate denied or restricted by another jurisdiction on grounds that constitution a violation of this subsection."  To the extent that Plaintiff argues that in this case, Meredith's reports to EPSB were not required by the state law, the Court again concludes that the grievance procedures provide adequate due process.

13

Finally, Plaintiff claims that Defendants interfered with his privacy interests under the Fourth and Fourteenth Amendments by sharing an e-mail that he transmitted to Payne. The claim of privacy rights in the exercise of liberty under the Fourteenth Amendment seems to create unusual cases. *See, e.g. Lawrence v. Texas*, 539 U.S. 558 (1993); *Griswold v. Connecticut*, 381 U.S. 479 (1965). Ours is not so unusual. A public employee has Fourth Amendment privacy rights. *O'Connor v. Ortega*, 480 U.S. 709 (1987). However, even if an individual has a legitimate expectation of privacy in his employer-provided e-mail, such a privacy right is not violated merely by one party to the communication voluntarily disclosing it to a third-party. *See, e.g., Smith v. Cincinnati Post and Times-Star*, 475 F.2d 740, 741 (6th Cir. 1973)("[e]ach party to a conversation, telephonic or otherwise, takes the risk that the other party may divulge the contents of that conversation, and should that happen, there has been no violation of the right of privacy.") Here, Plaintiff's e-mail was not intercepted by a third party. Rather, the recipient, Payne, disclosed the September 23, 2005 e-mail that Plaintiff sent her to their mutual employer. The e-mail was provided and controlled by Plaintiff's employer, and Payne's disclosure did not violate Plaintiff's privacy rights under the Fourth or Fourteenth Amendments.

## IV.

The Court now addresses Plaintiff's primary claims, those under the First Amendment. Plaintiff claims that the directives contained in the 2005 Reprimand violate his association and speech rights.[13]

---

[13]As noted above, the 2005 Reprimand contained two directives. The first requires Plaintiff to abide by the 2002 Memorandum (prohibiting any communication with Payne). The second states that "while an employee of the Jefferson County School System, you are not to represent Ballard or the Jefferson County Public Schools at any science alliance meeting, effective immediately."

14

The Constitution protects our "freedom of association in two distinct senses" from government interference.  *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987).  One is the right to intimate association - a protection of "an individual's choice to enter into and maintain certain intimate or private relationships."  *Id.* The second is the right to so-called expressive association which encompasses the "right to associate for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion." *Marcum v. McWhorter*, 308 F.3d 635, 639 (6th Cir. 2002)(quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)).

The first category involves those "deep attachments and commitment to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctively personal aspects of one's life." *Rotary*, 481 U.S. at 545 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619-20 (1984)).  Plaintiff seeks no relationship with either Payne or the LACA which is of the type that warrants constitutional protection.  Therefore, the Court must focus its attention on the second category of protected speech.

### A.

In the Sixth Circuit, a public employee's expressive association claim is analyzed under the same standard as a freedom of speech claim.  *Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003)(citing *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir. 1985)).  The Court must determine the contours of a public employee's speech rights from case law which does not precisely point to our unusual facts.[14]

---

[14]Because the same standard applies, when the Court refers to "speech" or "association," the reader should understand that the Court's analysis applies to both the speech and association claims.

In our particular case, JCPS occupies the place of both government and employer for First Amendment purposes.  Our courts have recognized that in such circumstances JCPS "may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  Despite this constitutional leeway, the First Amendment provides protection in two broad areas of employee speech or association.  The first area covers speech "when government employees speak or write on their own time on topics *unrelated to their employment*." *Id.* (quoting *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465, 475 (1995))(hereinafter "*NTEU*")(emphasis added).  The second area covers the right to speak on matters of public concern - "typically matters concerning government policies that are of interest to the public at large, a subject on which public  employees are uniquely qualified to comment." *Id.* (citing *Connick v. Myers*, 461 U.S.

138

(1983)); *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will City*, 391 U.S. 563 (1968).

This Court must determine whether the 2005 Reprimand intrudes upon the protections in either of these areas.  These fact specific applications of the First Amendment scope are for the Court to resolve.  *See v. City of Elyria*, 502 F.3d 484 (6th Cir. 2007)(citing *Connick*, 461 U.S. at 148 n.10).

### B.

The Court first considers whether Plaintiff's expressive association falls within the *NTEU* protection for speech that occurs outside of work and is unrelated to the subject of public employment.

16

The Supreme Court has already said that absent a reason "far stronger than mere speculation," where there is no relationship between the employees' speech and their effective performance of their public duties, public employers cannot regulate the speech that employees engage in outside of work. *NTEU*, 513 U.S. at 475.  In *NTEU*, federal employees challenged a law prohibiting them from receiving honoraria for publications and speeches they made in their spare time outside the workplace to segments of the general public.  The topics of their speech were not related to their official duties as public employees and included lectures on religion, black history, articles about the environment, and reviews of dance performances.  *Id.* at 461.  Noting that their messages had "nothing to do with their jobs" and no "relevance to their employment," the Supreme Court decided that the "expressive activities in this case fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace." *Id.* at 466.  The Court proceeded to apply the *Pickering* balance (discussed below) noting that the Government's burden is greater where "unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." *Id.* at 468.

Here, Plaintiff's involvement in LACA has some superficial similarities to a non-work speech or association.  The LACA meetings occur outside normal work hours, and are not an officially sanctioned school activity.  The meetings are open to non-public school teachers.  Moreover, as in *NTEU*, the ban on Plaintiff's participation in LACA chills potential speech before it happens.  For example, it bars Plaintiff from participating in any LACA meeting, no matter what the discussion will involve, and regardless of whether Payne actually attends.  Such a prohibition would seem overbroad and completely unrelated to the original infraction.

17

However, Plaintiff's LACA participation is related to his work in many other obvious and material ways.  The LACA discussions relate entirely or very closely to Plaintiff's work as a public school science teacher.  Indeed, his work forms the entire rationale for his participation.  Many of his public school colleagues, including Payne, are members, and at least some LACA meetings take place at public schools.  Discussions among colleagues about their professional goals and development are distinguishable from statements made to public audiences.  *See id.* at 466 (distinguishing speeches and articles addressed to a public audiences on topics unrelated to the speaker's government employment from private speech involving, for example, complaints about an employees job duties).  This would be a different case, for instance, if Plaintiff were meeting with non-school employees to discuss matters unrelated to science education.

Overall, the Court concludes that Plaintiff's LACA activities involve topics and associations closely related to Plaintiff's public employee duties.  The organization itself is closely identified with the public schools; Plaintiff founded it at the request of the Superintendent and attendance at LACA events counts toward a public school teacher's professional development credits.  The strong weight of the evidence is that the activities are not those "unrelated to their employment."  Therefore, the speech is not protected under *NTEU* and the Court need not balance Plaintiff's interest against the employer's asserted interest in enacting the 2005 Reprimand.  *See id.* at 465, 475; *City of San Diego v. Roe*, 543 U.S. at 81.

### C.

Notwithstanding this determination, the First Amendment still provides protection for work-related speech or associations which touch on matters of public concern.  The Court now considers whether the 2005 Reprimand restricts this right under the *Pickering/Connick* line of

18

cases.  Unfortunately, our facts do not present an easy fit.

The protection for speech on matters of public concern "reflects . . .the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143.  A matter of public concern is an expression "fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 146.  In other words, the court must determine whether the relevant speech "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Rodgers v. Banks*, 344 F.3d 587 (6th Cir. 2003)(internal citations omitted).  When speech involves a matter of public concern, a court uses the test adopted in *Pickering* which balances, "the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568.

On the other hand, when speech or association does not touch on a matter of public concern, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.*  Thus, if the speech does not involve a matter of public concern, it is not protected and "the *Pickering* balancing does not come into play." *City of San Diego*,  543 U.S. at 84; *Leary II*, 349 F.3d 888, 899; *see also Connick*, 461 U.S. at 146 (if an employee's speech cannot "be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [the Court] to scrutinize the reasons for her discharge.").

1.

Whether particular comments are a matter of public concern is a legal matter based on the particular circumstances.  First, the Court considers whether the 2005 Reprimand was issued in retaliation for Plaintiff's past protected speech or association.  To determine whether the 2005 LACA meeting or e-mail to Payne was protected, this Court must "look to the content, form, and context of the statements in light of the record as a whole." *Jackson v. Leighton,* 168 F.3d 903, 909-10 (6th Cir. 1999). A public concern is "a subject of legitimate news interest." *City of San Diego*, 543 U.S. at 526.

As a general matter, courts have frequently recognized speech criticizing an employer or exposing corruption or illegality to be a matter of public concern.[15]  *See, e.g., See*, 502 F.3d 484, 493 (6th Cir. 2007)(finding police officer's statements to FBI regarding police corruption involved a matter of public concern); *Chappel v. Montgomery County Fire Prot. Dist. No. 1,* 131 F.3d 564, 576-77 (6th Cir.1997) (rejecting defendants' argument that employee's speech alleging corruption and unethical conduct cannot address matters of public concern absent proof of the truthfulness of his speech); *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir.1986) ("[p]ublic interest is near its zenith when ensuring that public organizations are being operated in accordance with the law").

Our courts have also recognized teachers as "members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *See*, 502 F.3d at 493 (quoting *City of San Diego v. Roe,* 543 U.S. 77, 82 (2004)); *Pickering,*, 391 U.S. at 572-73 (1968)(rejecting the attempt of school

---

[15]On at least two occasions the Supreme Court has recognized that certain issues, namely racial discrimination and homosexuality, are "inherently of public concern" *See Rowland v. Mad River Local School Dist.*, 470 U.S. 1009, 1012 (1985)(noting a "public debate is currently ongoing regarding the rights of homosexuals."); *Connick v. Myers*, 461 U.S. 138 (1983).

administrators to "limi[t] teachers' opportunities to contribute to public debate" and noting that teachers are "the members of a community most likely to have informed and definite opinions" about school expenditures.); *Leary I,* 228 F.3d 729 (teachers' outspoken criticism on "student discipline and the appropriate educational program to be implemented" at a troubled public school were "of concern to the community at large."); *Leary II*, 349 F.3d 888 (teachers' "comments regarding the legality of educational programs, the discipline of students, and the violation fo school procedures" involve a matter of public concern); *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 895 (6th Cir. 2003)(teacher's allegations to state Office of Education Accountability regarding school board's failure to follow state law and internal procedures involved a matter of public concern).[16]

On the other hand, employee speech or association does not meet the public concern test when an employee merely makes statements of personal interest albeit in an official capacity. *Connick,* 461 U.S. at 147. More recently, the Supreme Court clarified that when employees make statements pursuant to their official duties, the First Amendment does not insulate their communications from employer discipline. *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006).  It follows that "[f]ederal courts normally do not review personnel decisions reacting to an employee's behavior when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest." *Akers*, 352 F.3d at

---

[16]In support of his statement provided to the Court on the "importance of the professional, competent and uninhibited teaching . . .of Science and Mathematics," Plaintiff submitted several news articles pertaining to science education both nationally (i.e. "Is America Flunking Science?") as well as a local editorial, letter to the editor, and news stories from The Courier-Journal.  Such articles and editorials are precisely the type of public dialogue in which a public employee should be allowed to participate without fear of retaliation.  That science education is reported and commented on in the local and national publications does not mean, however, that every meeting of science teachers is necessarily part of the public discussion on how best to educate students in science.

1037-38.  An association involving "purely private matters of little or no concern to the community as a whole" is not constitutionally protected for public employees.  *Id.* (finding a rule prohibiting state Department of Corrections employees from nonwork-related contact with prisoners, probationers, or their relatives did not touch on matters of public concern).  In *Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) the Sixth Circuit distilled the "public concern" test by stating that a court must determine: "the focus of the speech, the point of the speech in question, to what purpose the employee spoke, the intent of the speech, or the communicative purpose of the speaker." 370 F.3d at 592 (internal citations omitted).

## 2.

Bearing all this in mind, the Court turns to our particular circumstances.  Plaintiff has described the focus and purpose of LACA as a forum for teachers to discuss matters of professional development, develop safety protocols, discuss curriculum and textbooks, and share other information on issues of high interest and utility to science teachers.[17]  When asked by the Court for examples of LACA's work, Plaintiff described a recent meeting where teachers received training in chemical safety.  This example reveals that while LACA meetings provide important information to the teachers involved, it is not an organization whose purpose is to provide the general public with information.  Specifically, Plaintiff does not contend that the

---

[17] Plaintiff has provided several examples of how the 2005 Reprimand limits his expressive association in matters he regards as public concern.  "A.  Plaintiff's hands are tied and he is inhibited from performance as to the Eisenhower Funds program for the Advancement of Science, Title IIB, beginning in 1954 and now transposed into the Federal No Child Left Behind program; B.  Similarly, as to the $25,000,000.00 grant to Jefferson County Public Schools from the General Electric Corporation for the advancement of science; C.Finally, it is the actions of the Defendants herein, and the damage to his professional reputation, which now prevents Plaintiff from being included in professional development and grant-writing regarding the necessary advancement of science in the JCPS, a matter of the utmost public concern and interest.  As evidence of this, but not limited to this, he has been advised by a fellow teacher that any attention to or use of him as a participant on the grant committees will not be permitted by JCPS (Attachment J)." Second Am. Compl. 7-8.

September 2005 LACA meeting focused on resolving an issue of broad interest to non-science educators.  Moreover, Plaintiff does not describe LACA as a forum where teachers gather to criticize or air complaints regarding Defendants' implementation of science curriculum in public schools.  Indeed, its purpose is not to "bring to light actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 146.  In these respects LACA differs fundamentally from instances where the Sixth Circuit has recognized that a teacher's comments involve a matter of public concern.  *See, e.g. Learly I*, 228 F.3d 729; *Leary II*, 349 F.3d 888.

There is a distinction between matters of a public concern for First Amendment purposes and the internal workings of an organization which is valuable, important and consequential in general terms.  *See, e.g. Connick*, 461 U.S. at 149 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark . . . would plant the seed of a constitutional case."); To be sure, public school science teachers perform an invaluable and important service in educating the community's students.  LACA discussions contribute to that service.  The quality of science education has far-reaching consequences affecting students' competitiveness and preparedness.  However, Plaintiff has not explained how past LACA meetings, and in particular the meeting of September 2005, even if of great interest and utility for teachers meets the definition of a "public concern" for First Amendment purposes.

The conclusion that the September 2005 LACA meeting did not involve a matter of public concern dictates dismissal of Plaintiff's claim that the 2005 Reprimand was issued in retaliation for his participation in that meeting.  His speech or association in connection with LACA was not constitutionally protected since it did not involve a matter of public concern.

23

The Court,  therefore, need not proceed further with the retaliation analysis.[18]

3.

Notwithstanding all of this analysis, one more issue complicate the resolution of this

case.  The 2005 Reprimand conditions Plaintiff's continued employment on his agreement not to

communicate with Payne or attend LACA in the future.  Thus, it restrains his potential speech

and association before it happens.  This requires some attention because the Sixth Circuit's

approach in different prior restraint cases is not entirely consistent.

Most recently, in *Farhat*, the Sixth Circuit reviewed a rule prohibiting a public employee

from speaking to his co-workers during an on-going investigation. According to *Farhat*, the

appropriate analysis is the same as that employed under *Pickering/Connick* to determine whether

a public employer's discipline for an employee's past speech violated the First Amendment. 370

F.3d at 598 (citing *Jackson v. City of Columbus*, 194 F.3d 737 (6th Cir. 1999)(*abrogated on*

*other grounds*)).  Consistent with this thinking, in both *Farhat* and *Jackson,* the Sixth Circuit

either identified or assumed that the restricted speech involved matters of public concern *before*

conducting the *Pickering* balancing analysis.  The Court follows *Farhat* as the most recent and

consistent approach to the prior restraint analysis.[19]  It is entirely consistent with the well-

_____

[18]The same analysis leads the Court to the unavoidable conclusion that the private e-mail to Payne
regarding Plaintiff's plans to attend the Chemistry Alliance meeting does not involve a matter of public concern.
Rather, his plans to attend a particular meeting on a particular day is a matter of "personal interest" and "a federal
court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency
allegedly in reaction to the employee's behavior." *Connick* , 461 U.S. at 147.  The e-mail to Payne, therefore, cannot
support a First Amendment retaliation claim.

[19]By contrast to *Farhat* and *Jackson*'s use of the two-step *Pickering/Connick* test, in *Akers*, Judge Boggs
explained,  "Restraints on government employee speech, or government employee association not touching on a
matter of public concern, are *subject merely to rational basis scrutiny*." 352 F.3d at 1037 (emphasis added).  The
factual differences between *Akers, Farhat*, and *Jackson* do not satisfactorily explain why the *Jackson* and *Farhat*
courts determined that the court "would not engage in an evaluation of the reasons for the City's restriction," if the

recognized *Pickering/Connick* approach.  *Cf. NTEU*, 513 U.S. at 468 (noting the government's greater burden in justifying a ban that "chill potential speech before it happens" as opposed to "an adverse action taken in response to actual speech," but proceeding to balance the employer and employee interests *only after* concluding that the ban restricted speech on a matter of public concern.).  Accordingly, here as in *NTEU*, *Farhat,* and *Jackson*, the threshold inquiry is whether the 2005 Reprimand touches on a matter of public concern.

To do this, the Court must determine whether "a reasonable inference can be drawn" that Plaintiff would have spoken (or desires to speak) on a matter of public concern but for the restraint on his speech and association. *Jackson*, 194 F.3d at 747.  In such an inquiry, the Sixth Circuit does not require that an employee specifically allege what he or she would have said but for the restriction. *Id.* at 747-48.  And, the Circuit has been receptive to considering "all conceivable association" affected by a particular rule. *Akers*, 352 F.3d at 1038.  In view of this advice, this Court has probed this area extensively with Plaintiff and his counsel.

As previously discussed, however, Plaintiff's description of the focus, purpose, and communicative intent of LACA does not permit a reasonable inference that his involvement in LACA has touched on a matter of public concern as defined for First Amendment purposes. Certainly, Plaintiff's description of past or present LACA business or activities does not rise to the level of public concern.  That same evidence predicts the same result as to future conduct.

---

speech did not involve a matter of public concern, *Jackson*, 194 F.3d at 746, while *Akers* asserted that rational basis applied to restrictions on speech not of a public concern.  Indeed, the *Akers* review for rational basis seems inconsistent with the Sixth Circuit's view that "public employee's speech that involves matters of personal interest . . .are not protected." *Leary II*, 349 F.3d 888, 898 (6th Cir. 2003)(citing *Connick*, 461 U.S. at 147).  Perhaps the most practical way to reconcile the difference in applying rational basis review, is to acknowledge the extremely deferential nature of rational basis review, under which a challenged rule is almost always upheld. *See Akers*, 352 F.3d at 1039 n.3 (acknowledging that rational basis is satisfied by speculation "even unsupported by evidence or empirical data" and that the burden is on those who challenge it to "negative every conceivable basis that might support it.")(internal citations omitted).

Plaintiff has not indicated to the Court that it is likely that LACA's purpose or focus will change in the future to include criticism of public school science education, or to expose violations of the law or school procedure. Based on the limited information Plaintiff has provided, for the Court to conclude that Plaintiff has a First Amendment right to attend LACA would convert virtually every extra-curricular teachers' meeting or discussion into a matter of public concern. This would seriously impair Defendants' ability to effectively manage their employees in the course of routine and commonplace interactions.  The employee speech here seems to fall into the category of personal interactions which concerns employment. This is the category of expressive association which is not protected by the First Amendment as our cases define it.[20]

Because participation in LACA does not involve a matter of public concern and is not likely to do so, the Court need not consider the wisdom or reasonableness of Defendants' decision to prohibit him from attending at this time.  *See Connick*, 461 U.S. at 146 (discussing the non-reviewability of speech not touching on a matter of public concern and noting that in other contexts dismissals are "not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable"); *Farhat*, 370 F.3d at 598.

For similar reasons, the Court cannot reasonably infer that Plaintiff's future communication with Payne will touch on matters of public concern.  Concededly, the written terms of the prohibition do not limit it to speech at school-related events or to speech within a certain period of time, or on a certain topic.  It could be construed to potentially restrict at least

---

[20]Notably, the 2005 Memorandum only prohibits Plaintiff's attendance at science alliance meetings. Although it also restricts his ability to communicate directly with Payne, it does not limit him from attending non-science alliance events where she may be present.  Therefore, the 2005 Reprimand itself does not restrict Plaintiff's ability to participate in other committees.  But even if the GE grant and textbook development is considered newsworthy or of public interest, Plaintiff does not have a First Amendment right to have Defendants include or select him for certain non-contractual committee positions.

some protected speech. However, as his deposition testimony reveals, Plaintiff has no intention or desire to communicate information touching on a matter of public concern or to contact Payne outside of school-related events:

> Q: Mr. Baar, if you're successful in this action and it's determined that there is no present bar on your ability to contact Missy Payne, do you intend to contact Missy Payne?
>
> A: No, but I also do not intend to not go and be involved with activities such as committee meetings and professional development, and if contact incidental or otherwise occurs, that's going to happen, but it would all be of a professional nature.

Baar Dep. 121.  Thus, the only restraint is on Plaintiff's speech in conjunction with work-related contact.   As discussed above, the Court concludes that incidental contact at professional meeting does not touch on a matter of public concern.  Therefore, the Court need not proceed to balance Defendants' interest in restricting Plaintiff's speech against the Plaintiff's speech interests, since such speech is unprotected.

The Court will enter an order consistent with this Memorandum Opinion.


Date: February 8, 2008




cc:      Counsel of Record