# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

## CIVIL ACTION NO. 3:06-CV-75-H

ROBERT LEWIS BAAR                                              PLAINTIFF

V.

JEFFERSON COUNTY BOARD OF                              DEFENDANTS
EDUCATION, et al.

## REVISED AND FINAL
## MEMORANDUM OPINION

Plaintiff, Robert Baar, is a high school science teacher for the Jefferson County Public Schools ("JCPS") who brought this suit challenging the constitutionality of certain disciplinary actions taken against him. Defendants are: (1) the Jefferson County Board of Education ("JCBE"); (2) Stephen W. Daeschner, former superintendent of JCPS; (3) Carolyn Meredith, the Director of Employee Relations for JCPS; (4) Melissa Payne, another science teacher with JCPS who objected to Baar's communications with her; (5) Marsha Dohn, principal of Jeffersontown High School; (6) Minor Daniels, former Executive Director of Business Affairs for JCPS; and (7) James Jury, principal at Ballard High School. Plaintiff sued all of the individual defendants both in their official and individual capacities, seeking both injunctive relief and damages.

This case returns to this Court on remand from the Sixth Circuit. Now, Defendants move for summary judgment on a variety of grounds, most particularly based upon the doctrine of qualified immunity. The Court issued a preliminary opinion and then requested additional briefing. The Court now files its Revised and Final Memorandum Opinion which discusses these difficult issues and explains why Defendants are entitled to qualified immunity.

**I.**

The Court's prior opinions contain a more detailed discussion of the facts surrounding this case.  For purposes of the present motion, the following facts and procedural history are relevant.

In early February 2002, Plaintiff was teaching at Jeffersontown High School and sent several letters to Defendant Melissa Payne, another Jeffersontown teacher.  Ms. Payne considered the letter to be threatening and complained to Defendants Dohn, her principal, and Meredith.  School officials agreed with Ms. Payne.  Thereafter, Plaintiff entered a memorandum of understanding requiring him "to discontinue communication in any form" with Ms. Payne.  A few months later, after further investigation, Dohn issued a formal reprimand containing a similar prohibition (the "2002 Reprimand").  For about three years, Plaintiff had no contact with Ms. Payne.

In September, 2005, Plaintiff received a notice of the next meeting of the Louisville Area Chemistry Alliance ("LACA"), a group of local chemistry teachers that Plaintiff had co-founded and had regularly met with through 2001.  Plaintiff had voluntarily stopped attending LACA meetings since sometime in 2001.  Nevertheless, on September 23, 2005, he emailed Ms. Payne that he would be attending the upcoming meeting.  Ms. Payne was the designated contact person for the LACA meeting.  This message violated the terms of the Memorandum of Understanding and the 2002 Reprimand.  Ms. Payne was upset and reported all of this to Dohn and Meredith.

Mr. Jury, who was Plaintiff's principal, tried to convince him not to attend the meeting and told him that the 2002 Reprimand would prohibit his contact with Ms. Payne, including his attendance at this LACA meeting.  Despite this admonition, Plaintiff continued to insist on

attending the meeting.  At this point, Jury issued another formal reprimand (the "2005 Reprimand").  The 2005 Reprimand required that Plaintiff abide by the 2002 Reprimand and prohibited him from "representing . . . the Jefferson County Public Schools at any [LACA] meeting."   Plaintiff correctly interpreted the 2005 Reprimand as prohibiting his attendance at LACA meetings.

Plaintiff's lawsuit eventually followed.  After extensive discovery and motion practice, on February 8, 2008, this Court granted Defendants' motion for summary judgment on all claims. Of particular interest now, this Court analyzed JCPS's prohibition of Plaintiff's attendance at LACA meetings under *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) (herein after "*NTEV*") and *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will City*, 39 U.S. 563 (1968).  The Court found, as a matter of law, that Plaintiff's association with the LACA was not a matter of public concern.  To undertake the *Pickering* balancing test, therefore, was unnecessary.  Plaintiff appealed on all issues.

The Sixth Circuit affirmed all the dismissals except the claim that Jury and Meredith violated Plaintiff's right to freedom of association by prohibiting his attendance at all future LACA meetings.[1]  As to the LACA meetings, the Circuit made two rulings of significance for the current motions.  First, it held, as a matter of law, that Plaintiff's association with the LACA was a matter of public concern and, therefore, any prohibition of it was subject to the *Pickering* balancing test.  Second, it said that Plaintiff had satisfied the *Pickering* test "at this stage of the case" and that he had presented sufficient evidence to avoid summary judgment.  The Sixth

---

[1] The First Amendment claims against all Defendants are also revived because their dismissal was based on this Court's "public concern" ruling.

Circuit did not say that Plaintiff himself was entitled to summary judgment.[2]

After the Circuit Court decision, JCPS and Jury removed the ban on Plaintiff's attendance of LACA meetings. Upon remand, this Court set a trial date for the earliest convenient date. Soon afterwards, Defendants filed the current dispositive motions. The Court will identify and consider each relevant issue in turn.

## II.

As a division of local government, JCBE may be sued directly. *See Memphis Police Dept. v. Garner*, 471 U.S. 1 (1985).[3] Moreover, its employees may be sued for constitutional violations under two concurrent legal theories: (1) the employee may be sued in her official capacity; and (2) the employee may be sued in her personal (sometimes called "individual") capacity. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In this section, the Court will consider claims against JCBE and the individuals in their official capacities. Success of either of these claims would result in a judgment directly against the Jefferson County Board of Education.

## A.

Suing a government employee in his official capacity "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Id.* at 165-

---

[2] Plaintiff argues that the Sixth Circuit was, in effect, directing a judgment in his favor. This seems doubtful. Certainly, the Sixth Circuit did not say so directly. Moreover, this Court did not consider summary judgment for Plaintiff under the *Pickering* test. Consequently, it was not an issue on appeal.

[3] Where the defendant is an employee of a state government or one of its departments, the Eleventh Amendment to the United States Constitution provides absolute immunity from suit in federal court, except where it is waived. However, JCBE is deemed a division of local government, not a department of state government. *See Ghassomians v. Ashland Independent School Dist.*, 55 F.Supp.2d 675, 682 (E.D. Ky. 1998). This status should not be confused with the Kentucky Supreme Court's separate view that local school boards are arms of state government for state law sovereign immunity purposes. *Clevinger v. Board of Education of Pike County*, 789 S.W.2d 5, 10-11 (Ky. 1990).

66 (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978)).

"As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)). Here, JCBE did receive notice of this suit against its employees and itself, and has responded appropriately. Thus, any judgment against the individual defendants in their official capacities will, in reality, be a judgment against JCBE and will only be collectible against JCBE.

The Sixth Circuit has never specifically decided whether district courts should actually dismiss official capacity claims where the local governmental entity is already a party.[4] In the Eastern and Western Districts of Kentucky, however, the judges have adopted the practical approach of dismissing the official capacity claims. *See Clark v. Kentucky*, 229 F.Supp.2d 718, 721-22 (E.D. Ky. 2002); *Meredith v. Jefferson County Bd. Of Educ.*, No. 3:02-CV-620-H, 2007 WL 3342258, at *2 (W.D. Ky. Nov. 9, 2007). This Court believes this is the more logical approach. Thus, the official capacity claims will be dismissed and the Court will next consider the potential damages liability of JCBE itself. To the extent Plaintiff is entitled to injunctive relief, the Court can impose such an order upon JCBE, its officers, agents and employees.

**B.**

So far in this litigation, neither this Court nor the Sixth Circuit has had occasion to

---

[4] However, the Circuit has affirmed the dismissal of a damages claim against state officers in their official capacities based on the Eleventh Amendment because a suit against officers in their official capacity is the same as a suit against the state. *Doe v. Wigginton*, 21 F.3d 733, 736-37 (6th Cir. 1994) ("a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself, [because] the state is the real, substantial party in interest.") (citations and quotations omitted). Although this claim involves a local governmental entity, the same logic would appear to apply.

consider whether JCBE, either directly or through suit against an employee in her official capacity, could be liable to Plaintiff for violations of his constitutional rights. The Supreme Court has described the circumstances for such § 1983 liability in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). A local governmental entity is considered a person within the meaning of § 1983, *Id.* at 662; it has no liability simply because its employee violates another's constitutional rights, *Id.* at 691; and it is liable only where the employee's act represents an official policy or custom of that government, *Id.* at 694. *See also Kentucky v. Graham*, 473 U.S. 159, 167 (1985). Since *Monell*, the Sixth Circuit has elaborated on the scope of municipal liability:

> While [local governing bodies are] not liable under respondent superior for an employee or officer's acts, it may be sued for having caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Since such bodies can act only through natural persons, the critical question is whether the person committing the act did so pursuant to official policy. A formally adopted policy is not required; established usage or custom may be sufficient.

*Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952, 957 (6th Cir. 1993). Under this jurisprudence, the actions of a single official can also only create liability for the local government where that official has "final policymaking authority." *Id.* "[W]hether an official has such final authority is a question of state law." *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).

In fact, the *Adkins* case is particularly instructive here. The Sixth Circuit confronted a superintendent's decision not to recommend a secretary for contract renewal because she would be working for her husband. The Circuit found that this action infringed upon the secretary's constitutional right to privacy in intimate relationships. Nevertheless, the school board itself was

not liable for the superintendent's actions. First, it had no policy regarding the hiring of spouses. Under Kentucky state law, the school board itself made all final decisions relating to personnel hiring and firing. While it was true that the superintendent must recommend a candidate for the school board to consider the candidate, the Court nevertheless found that the school board, not the superintendent, had "final policymaking authority." *Id.* at 959. Therefore, the Court dismissed the claims against the school board, holding that they were not liable under *Monell*. *Id.* In light of the explanation in *Adkins*, the result here is pretty clear.

As in *Adkins*, no one contends here that Jury acted "pursuant to official policy" when he decided to bar Plaintiff from future LACA meetings. Nor is there evidence in any of the discovery that either Jury or Meredith had final policymaking authority such that JCBE might be liable under the *Monell* doctrine. Moreover, the Court has found no state law placing final policymaking authority over teacher discipline with principals or human relations managers.[5] All state laws appear to vest employee policy decisions in either the school board or the superintendent. *See* KRS §§ 161.790, 160.370 & 160.340.

No evidence suggests that Defendant Daeschner, the superintendent, approved Jury's action. Even if Daeschner was eventually made aware of the reprimand and did not remove it, such a failure to act does not give rise to school board liability. *See Adkins*, 982 F.2d at 958 ("The fact that the Board did not question Whitaker's decision to not recommend employment for Mrs. Adkins is immaterial. The plurality opinion in *Praprotnik* addressed this question: 'Simply going along with discretionary decisions made by one's subordinates, however, is not a

---

[5] The only defendants involved in the decision of how to reprimand Plaintiff were Jury (a principal) and Meredith (the human relations manager).

delegation to them of the authority to make policy.'"). Here, as in *Adkins*, Jury's 2005

Reprimand did not represent fulfillment of any established JCBE custom or policy, nor was it

undertaken by a final decision maker, which appears to be JCBE or Daeschner.  It was a

discretionary act taken in special circumstances and cannot be deemed a basis for JCBE's direct

liability.  Plaintiff claims no other basis for liability on the part of JCBE.

Therefore, the Court finds, as a matter of law, that JCBE is not liable under § 1983, either

directly or through any official capacity claim.

**III**.

Defendants' central argument is that qualified immunity bars recovery of any damages

against the individual defendants in their personal capacities.  Before considering qualified

immunity substantively, however, the Court must determine whether Defendants have waived

the defense either by failing to assert it or by waiting too long to file a motion to dismiss on this

ground.[6]  Immunity must be affirmatively pleaded, *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir.

1994), and Defendants have done so.  In their answer to the original complaint, Defendants pled,

"Seventh Defense: Some or all of Plaintiff's claims are barred by immunity and/or Plaintiff's

failure to name an indispensable party."  Merely pleading the defense, however, may not end

Defendants' responsibilities.

The complaint was filed in 2006; extensive discovery followed; summary judgment was

granted; and then reversal on appeal.  During this entire time, Defendants did not move for

dismissal on the grounds of qualified immunity.  Only now have Defendants raised the defense

---

[6] Plaintiff did not raise this argument in his initial response to Defendants' motion.  Nevertheless, the Court identified waiver as a relevant issue and discussed it in its October 27, 2009, Memorandum Opinion.  Contrary to counsel's suggestion, this Court has never taken the position that Plaintiff had waived objection to the lateness of Defendants' qualified immunity motion.  The only issue has been Defendants' possible waiver.

by motion. Thus, having obtained a judgment from the Sixth Circuit that his rights may have been violated, Plaintiff now faces a qualified immunity motion which will either bar his claim or further delay it through interlocutory appeal. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding that the denial of a claim of qualified immunity is an appealable "final decision" within the meaning of 28. U.S.C. § 1291).

The Sixth Circuit has not comprehensively addressed the circumstances under which defendants might actually waive their qualified immunity defense. However, several Sixth Circuit panels have held generally that a "waiver" of qualified immunity at one stage of the litigation does not necessarily constitute a waiver for all future stages. *English*, 23 F.3d at 1090 (citing *Kennedy v. City of Cleveland*, 797 F.2d 297, 300-01 (6th Cir. 1986)); *Abel v. Harp*, 278 Fed. Appx. 642, 648 (6th Cir. 2008) (finding that the defendant did not waive qualified immunity by failing to assert it in his pre-answer motion to dismiss that was granted and then asserting it for the first time on remand). *See also Brown v. Crowley*, 312 F.3d 782 (6th Cir. 2002).

The case of *Brown v. Crowley* is particularly instructive. There, the defendants initially moved to dismiss all claims. The trial court dismissed some claims and retained others. Then defendants moved for summary judgment on the remaining constitutional claims without arguing qualified immunity. The district court granted that motion. The plaintiff appealed and one year later the Sixth Circuit affirmed except for a retaliation claim. Upon remand, two new defendants moved for summary judgment, but did not argue qualified immunity. Another year later, the Sixth Circuit vacated and remanded the district court's judgment. In reaching its decision, the court touched on qualified immunity, which, after several years, defendants had yet to raise by motion:

We need not address this argument, however, because the defendants did not raise the affirmative defense of qualified immunity in their motion for summary judgment. Although the defendants preserved the defense in their first responsive pleading and in their answer to Brown's complaint, they did not pursue this argument before the district court in the motion for summary judgment that they filed after the case was remanded. The Seventh Circuit has explained that, even if a defendant has "raised" the affirmative defense in a responsive pleading, "the defense of qualified immunity may be deemed as waived if not properly and timely presented before the district court." *Walsh v. Mellas*, 837 F.2d 789, 799 (7th Cir. 1988). "[T]he cases holding that an omission of this character constitutes a waiver of the right to present that issue on appeal are legion." *Id.* at 799-800 ("The mere fact that an obscure reference to [an affirmative defense] is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal."). We find this reasoning persuasive. *See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1488 (6th Cir. 1991) ("Issues not presented to the district court but raised for the first time on appeal are not properly before the court."). We will not therefore, address the defendants' argument that they have qualified immunity from Brown's claim.

On the other hand, as we discuss below, the judgment of the district court must be vacated and the case remanded for further proceedings, because the district court erred in its application of the law to Brown's retaliation claim. The defendants will thus be free to reassert their immunity defenses in the district court. *See English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (explaining that a waiver of an official-immunity defense "need not waive the defense for all purposes but would generally only waive the defense for the stage at which the defense should have been asserted"). *Brown*, 312 F.3d at 787-88.

Thus, the Circuit did not address qualified immunity but noted in passing that defendants could assert the defense on remand. While these cases are neither directly on point nor comprehensive in their analysis, *Brown* in particular provides a window into the Circuit's thinking in the absence of any other Circuit guidance.[7]

Our case originally contained multiple claims. Qualified immunity may not have applied to all of them. Defendants raised the defense in their answer but not in their first motion for

---

[7] In other circuits, defendants who fail to assert qualified immunity until after an appeal face waiver of the defense. *See Sales v. Grant*, 224 F.3d 293, 296-97 (4th Cir. 2000) (finding that the defendants waived qualified immunity by failing to pursue it prior to remand even though the defendants technically pled "immunity" in their answer); *Maul v. Constan*, 928 F.2d 784 (7th Cir. 1991) (holding the same).

summary judgment.  At this stage in the proceedings and after the first appeal, the issue is much

narrower.  There is no reason to suspect that Defendants' motives were improper, and, as

evidenced by *Brown*, the circumstances here are not unusual.  The Sixth Circuit appears to give

broad latitude for defendants to raise qualified immunity even after dispositive motions and

appeals have proceeded for some time.

Therefore, this Court concludes that Defendants may raise this defense by motion at this

time.

## IV.

Finally, the way is cleared to consider the substance of the individual Defendants'

qualified immunity defense.  This is the most delicate of the issues this Court faces.  "Qualified

immunity is an affirmative defense that extends to government officials performing discretionary

functions."  *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999) (citing *Harlow v. Fitzgerald*,

457 U.S. 800, 817-18 (1982)).  As the Sixth Circuit explained, "[u]nder this judicially created

exception, government officials are immune from civil liability when acting in an official

capacity if their actions do not violate 'clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Id.* (quoting *Harlow*, 457 U.S. at 818).

Qualified immunity would act to bar all damages claims against Defendants in their personal

capacities.[8]

---

[8] Qualified immunity can apply only where the governmental employees engaged in discretionary
governmental functions.  *Id.*  When developing the 2005 reprimand, Jury and Meredith did not follow any simple
procedure or standard punishment policy.  Rather, they crafted a remedy for unusual circumstances.  Courts
routinely hold that such actions constitute the type of discretionary governmental function to which qualified
immunity may apply.  *See, e.g., McCullough v. Wyandanch Union Free School District*, 187 F.3d 272 (2d Cir. 1999)
(applying qualified immunity where a teacher was terminated in violation of his free speech rights); *Lytte v.
Wondrash*, 182 F.3d 1083 (9th Cir. 1999) (applying qualified immunity where teacher was terminated for his
negative statements about the school district).  By this same logic, the actions of Jury and Meredith are clearly
discretionary governmental functions.

Here, Plaintiff asserts his constitutional right to freely associate with the LACA. Without doubt, Plaintiff's right to freedom of association is "clearly established" in the abstract. However, such an abstraction does not sufficiently define the Court's inquiry. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("[I]f the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of [qualified immunity under] *Harlow* [*v. Fitzgerald*, 457 U.S. 800 (1982)].")."). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

Thus, this Court's more specific inquiry is whether the following two distinct rights were so clearly established that reasonable school officials would have understood them: (1) that Plaintiff's speech or association with the LACA involved a matter of public concern; and (2) that Plaintiff's interests in speaking or associating on the matter of public concern outweighed the government's interests in efficiency. *See Garvie v. Jackson*, 845 F.2d 647, 651 (finding that qualified immunity applied because reasonable officials could have disagreed on either of these points). These are issues of law for this Court now to decide. *Lewis v. Cowen*, 165 F.3d 154, 166-67 (2d Cir. 1999). If reasonable school officials could have disagreed on either issue, qualified immunity applies. *Id.* Thus, this Court will address each issue in turn.

**A.**

The Sixth Circuit has held in this case that attendance at LACA meetings was a matter of public concern. Whether that rule was clearly established prior to the ruling is an entirely different question.

Consistent with this evidence, the Sixth Circuit also stated that the LACA focused on teacher self-improvement, rather than advocacy.[9] It concluded, however, that "the services provided by LACA – holding professional-development classes, developing safety protocols for in-classroom lab experiments and providing a forum to discuss the science curriculum, textbooks, lesson plans, effective teaching techniques and ways to improve science education – have a value not only to chemistry teachers (such as Baar) but to the general public as well." It concluded that these attributes were sufficient to constitute issues of public importance and concern for purposes of First Amendment freedom of association. These facts give a broad definition to an association with a public concern.

Prior to the time of the 2005 Reprimand, the Sixth Circuit had said that teachers speaking in public on educational policy and curriculum met the definition of a public concern. *Leary v. Daeschner ("Leary II")*, 349 F.3d 888, 900 (6th Cir. 2003). It had also said that a teachers' individual curriculum and pedagogical choices made while teaching amount to matters of public concern. *Evans-Marshall v. Board of Education of Tipp City*, 428 F.3d 223 (6th Cir. 2005); *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036 (6th Cir. 2001). These cases are quite

_____

[9] This Court's own independent examination of the record, including all depositions on file, results in a similar conclusion. Mr. Baar identified its purpose as a method of "improving and stabilizing science." (Baar Dep., DN # 94, 19:21-23, Oct. 31, 2007.) In this way, the group helped science teachers better themselves in the classroom. Carolyn Meredith testified that teachers could earn professional development credits necessary to continue their employment by attending LACA meetings. (Meredith Dep., DN # 90, 42, Nov. 30, 2007.) There is no indication that the LACA makes any public statements or releases any information to the public.

different than ours because Baar was neither speaking in public nor in a classroom.

Nevertheless, these opinions do suggest that, regardless of the forum, the Sixth Circuit would

likely consider any discussion of education or curriculum as matters of public importance and,

therefore, of public concern. Considering this expansive view of the identified right and the

evidence here, one can view these cases as clearly establishing, likewise, that attendance at the

LACA meetings would be a matter of public concern.[10]

**B.**

Next, the Court considers whether a reasonable official in Jury or Meredith's position

would have known that Plaintiff's interests in attending the LACA meetings outweighed the

_____

[10] This result is by no means clear cut and the Court acknowledges some sound reasons for a different one. Some of these issues become important later when the Court considers whether the *Pickering* balancing test was clearly established in Plaintiff's favor.

In *Leary II* and *Evans-Marshall*, the teachers in question were actually exercising their right to speak out in and to the public. They were effectively silenced. Baar was never prevented from speaking out in public. Here, the LACA does not speak out or even make recommendations. It does not provide any information to the public from which the public would need to make informed decisions about the operation of their government. *See Leary II* at 899. Rather, the LACA acts internally and is more like a continuing education seminar.

Plaintiff had not attended a meeting in four years and was not in any way prohibited from speaking out on any educational issue. He was not prevented from attending meetings of any other similar groups and could fulfill his professional development credits by other means. In its own opinion, the Sixth Circuit acknowledged that the LACA association was not the quintessential example of public concern speech. *Baar v. Jefferson County Bd. of Educ.*, 311 Fed. Appx. 817, 822 (6th Cir. 2009). That comment alone suggests that the specific contours of the right found here may not have been so clear.

Further, the Sixth Circuit has routinely held that discussion of internal policies, even when related to important subjects such as corruption, is not a matter of public concern. *See, e.g., Thomson v. Scheid*, 977 F.2d 1017, 1021 (6th Cir. 1992). The materials covered at the LACA meetings, namely the proper method for teaching science, seem to closely resemble a discussion of internal policies and practices. Unlike *Leary II* and *Evans-Marshall*, there is no evidence that the LACA discussions concerned specific course content, as opposed to methods of teaching.

Finally, the Sixth Circuit found the in-class curriculum in *Evans-Marshall* and *Cockrel* to relate to matters of public concern specifically because highly controversial topics such as race, gender, and sexuality were discussed. There is nothing to indicate that the LACA meetings covered such controversial topics, or even topics in which the general public was overly interested.

Thus, there would seem to be significant room for disagreement about whether mere attendance at LACA meetings constitutes a matter of public concern under Sixth Circuit and Supreme Court First Amendment jurisprudence in late 2005. *See City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84 (2004) ("These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication.").

school district's legitimate interests in prohibiting attendance. *See Guercio v. Brody*, 911 F.2d 1179, 1185 (6th Cir. 1990). From the outset, the Court notes the inherent difficulty in deciding whether a reasonable person would ever know where the *Pickering* balancing test would eventually fall in these circumstances. By its very nature, a balancing test requires weighing various factors and reasonable persons may easily disagree as to the weight of each factor. As the Sixth Circuit has stated, "We agree that in many public employee free speech cases it would be unclear to a reasonable official what the outcome of the balancing inquiry should be." *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994). Nevertheless, the mere existence of a balancing test does not entitle defendants to qualified immunity. *See Stern v. Shouldice*, 706 F.2d 742, 749 (6th Cir. 1983).

### 1.

This Court has extensively reviewed all of the Circuit's qualified immunity jurisprudence in *Pickering* cases to determine how those principles may apply here.

The Sixth Circuit generally finds qualified immunity unless a previous case with very analogous facts held that the individual's interest in free speech outweighed the government's interest in efficiency. *See, e.g., Williams*, 24 F.3d at 1536-37 (finding the plaintiff's right to speak out against political patronage and government corruption was clearly established because of prior case law addressing the same issue).[11] The Court finds no such case. Most cases disallowing qualified immunity concern retaliation, where the employee is punished in some

---

[11] However, even this generally applicable rule does not always result in a finding that the *Pickering* balancing test weighs in favor of the plaintiff. In *Guercio*, 911 F.2d at 1189, the Circuit granted qualified immunity to a judge who fired a confidential secretary because she spoke out against a bankruptcy judge nominee. Although other cases had certainly found speaking out on political positions to be a matter of public concern, the Court found that the specific facts of the case, including the need for inter-chamber harmony, cooperation and collegiality between judges and court personnel, could lead reasonable judges to disagree about the result of the balancing test.

fashion for speaking publicly against government corruption or for speaking publicly on matters of public safety. Ours is quite different and rather unusual case. Here, Defendants had a legitimate need to keep Plaintiff apart from Ms. Payne, but probably went too far by broadly prohibiting him from associating with LACA under all circumstances. However, the Court has found no analogous cases which could have guided school officials about the proper balancing of interests.

More recently, the Sixth Circuit observed about the *Pickering* test that "the greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency the more likely a reasonable person would be to understand that the employer's actions violated the Constitution." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006).[12] This observation would work to Plaintiff's disadvantage here. As the panel decision noted, our case is not a quintessential example of expression on a public concern. The LACA meetings did not concern controversial topics and did not involve information necessary for current decisions. No one prevented Plaintiff from speaking out nor punished him for doing so. Thus, while Plaintiff's attendance at LACA meetings was a matter of public concern, that public concern was not of the highest order. On the other hand, and as the Sixth Circuit recognized, Defendants' interests in office efficiency and harmony were substantial and undisputed. Therefore, our case seems the flip side of *Scarbrough*, presenting circumstances where more likely reasonable school officials would believe that a *Pickering* balance favored them.

---

[12] In *Scarbrough*, the plaintiff announced his intention to appear as a featured speaker at a convention of individuals favoring homosexual rights. This presented a classic application of his first amendment rights. Consequently, the court's reversal and denial of qualified immunity is hardly surprising. Its *Pickering* balancing analysis bears little resemblance to our case.

**2.**

A review of two pre-2005 cases demonstrates the difficulty of predicting the *Pickering*

analysis.[13]  In *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001), the Sixth Circuit found that the

plaintiff, a community college professor, was speaking on a matter of public concern when he

circulated a sexual harassment complaint against him and spoke out against such complaints.

However, it found that the school's interest in protecting the complaining student, disciplining

the professor for his actions, and creating an environment free of faculty disruption, outweighed

Plaintiff's speech interests and justified his suspension.  *Id.* at 823.[14]  Here, Plaintiff's interests of

general association are somewhat weaker than the professor's right to speak out.  On the other

hand, JCPS's interests and those of the college in *Bonnell* are similar, that is maintaining a

school environment free of disruption and abuse.  Reasonable officials in the position of Jury or

Meredith could believe, therefore, that the *Pickering* balancing test favored them as it favored

the college.  Indeed, knowing that Plaintiff had ceased attending LACA meetings for several

years, Jury might reasonably have thought that the 2005 Reprimand would not have actually

deprived Plaintiff of any significant rights of association.

About the same time*,* another Sixth Circuit panel reversed a summary judgment for the

school board, determining that a teacher's interest in discussing matters of public concern in the

classroom outweighed the school district's interests in maintaining teacher loyalty.  *Cockrel v.*

*Shelby County School Dist.*, 270 F.3d 1036.  The school board could not demonstrate a strong

---

[13] It is imperative to acknowledge that these and other *Pickering* cases do not create a seamless body of
either analysis or results.

[14] In *Bonnell*, the Circuit reversed the district court's grant of injunctive relief in favor of the professor.  It
also commented that the defendants would have been entitled to qualified immunity.  *Id.* at 823-24.

need for the discipline because the school district caused the problem by previously approving the teacher's plan to teach these subjects. *Id.* at 1054-55 ("While ordinarily we would give substantial weight to the government employer's concerns of workplace efficiency, harmony, and discipline in conducting our balancing of the employee's and employer's competing interests, we cannot allow these concerns to tilt the Pickering scale in favor of the government, absent other evidence, when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech."). Thus, *Cockrel* remained consistent with the rule that the court will give "substantial weight" to the school board's interests where those interests, as here, are legitimate and clearly explained.

These two recent cases do not give clearly established guidance in our circumstances. In sum, the Court is not convinced that a reasonable official in the position of Jury or Meredith would have *known* that Plaintiff's interests outweighed those of Defendants.

**3.**

The final consideration giving this Court considerable pause is the Sixth Circuit's broadly worded opinion in this case. The Circuit clearly expressed its view that "[a]t this stage of the case, the claim also satisfies *Pickering* balancing." *Baar v. Jefferson County Bd. of Educ.*, 311 Fed. Appx. 817, 822 (6th Cir. 2009). As a matter of personal and judicial respect, the Court desires to accord appropriate deference and application to the Sixth Circuit opinion in this case. The Court also owes respect to Plaintiff and his desire for trial on his claims under applicable law. Nevertheless, the Circuit's take on the *Pickering* balance is not the same as deciding a motion for qualified immunity. Indeed, it presents an entirely different issue, and, sometimes, a different result. *See Guercio*, 911 F.2d at 1184 ("Without concluding where that balance

18

ultimately comes to rest - a decision reserved for the trier of fact - this court must dispose of the motion to dismiss on the basis of qualified immunity pursuant to the dictates of *Harlow*, *Malley*, *Anderson*, *Garvie*, etc., by determining whether [the plaintiff's] rights under *Pickering*, as opposed to whether the general teachings of *Pickering*, were so clear at the time in question that reasonable minds could not differ on the constitutionality of her discharge.").

The primary basis of the Circuit's conclusion that *Pickering* weighs in favor of Plaintiff was the breadth of the prohibition from attending any future LACA meetings without regard to the presence of Payne. Certainly, the school board could have developed alternative methods of accomplishing its legitimate goal of preventing interactions with Payne. However, the Court is acutely aware of the reality of this reprimand. Jury had requested that Plaintiff not attend the LACA meeting to which he sent the RSVP because Plaintiff's presence was upsetting to Payne. Plaintiff flatly refused and his presence would have caused disharmony. At that point, the school officials could have reasonably believed that their need to enforce their disciplinary practices and ensure an harassment-free work environment outweighed Plaintiff's real interest in attending the meetings, especially given the fact that Plaintiff had voluntarily not attended one in over four years.

Moreover, the Circuit's opinion acknowledged that JCPS had a "substantial interest in curbing Baar's improper communications with Payne, which ran the risk of compromising the school board's ability to deliver a valuable education in an harassment-free work environment." *Id.* The Circuit even affirmed the prohibition on Plaintiff having any further contact with Payne. In fact, the Circuit concluded that the breadth of the prohibition only "tips the balance in Baar's favor." *Id.* Where the *Pickering* balancing test only "tips in favor" of one side, it is again

19

difficult for reasonable school officials to predict its eventual ending place with certainty.

The Court respectfully finds no pre-existing Sixth Circuit or Supreme Court precedent that clearly established Plaintiff's rights such that a reasonable official in similar circumstances would have known that prohibiting Plaintiff's attendance at the LACA meetings violated Plaintiff's constitutional rights.

**V.**

Defendants also move for summary judgment on claims against Defendants Dohn, Payne, Daeschner, and Daniels because none of these Defendants actually issued the 2005 Reprimand.[15] Only Jury and Meredith can be said to have done that. As a general rule, to be liable for an act under § 1983, these other persons must have done something more than have known of the action and failed to stop it. They must at least implicitly authorize, approve or knowingly acquiesce to the unconstitutional conduct. *Shehee v. Luttrell*, 199 F.3d at 300. Neither the Sixth Circuit nor this Court has considered these issues. The Court will now do so for each Defendant in turn.

First, Payne is a teacher for JCPS. According to the evidence, her only role in the events was to report and object to the email that she received from Plaintiff. She has no authority over Plaintiff or Jury, the person responsible for the reprimand. In these circumstances, she cannot be liable for Jury's actions or Plaintiff's damages. *Id.* at 300-01. ("The defect in Shehee's claim is that neither Fleming nor Morgan were involved in his firing, the alleged adverse action. Despite Shehee's contention that Fleming and Morgan instigated his firing, these men did not have the

---

[15] Claims based upon any actions prior to 2005 have already been dismissed based upon the statute of limitations.

ability to terminate Shehee from his commissary position.  For this reason, Shehee simply does not set forth a valid First Amendment retaliation claim against Fleming or Morgan.").  Such a limited and perfunctory role does not to give rise to any personal liability.

The same is true of Defendant Dohn.  While Dohn was Plaintiff's superior in 2002, she was not his superior in 2005 when the unconstitutional reprimand occurred.  For this reason and others, Dohn did not exercise any authority to require a reprimand or to instruct Jury how to reprimand Plaintiff.  Therefore, while Dohn may have reported the email to other JCBE employees and requested that action be taken, Dohn cannot be responsible for the specifics of the eventual reprimand.  *See id.*  The facts do not support a claim against Dohn.

Defendants Daeschner and Daniels[16] were Jury's superiors and, in theory, could have directed Jury's actions.  However, there is no evidence that either did so.  Personal liability of supervisory personnel "must be based on more than merely the right to control employees.  Without more, such a theory would allow liability on a respondeat superior basis - a basis expressly rejected by the Supreme Court in *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978)."  *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 872 (6th Cir. 1982).  In essence, there must be "a showing that the official either encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Id.* at 874.  There is no such showing here.

As for Daniels, Plaintiff does not offer any evidence connecting him to the 2005 Reprimand or explaining why he should be liable.  Daniels' only involvement in this case

---

[16]Defendant Daniels unfortunately passed away on July 6, 2008.  Although it is unclear whether Plaintiff intends to proceed against Daniels' estate, the Court will assume that he does.

appears to be his investigation of the original incident between Payne and Plaintiff in 2002.  As for Daeschner, Plaintiff asserts that Daeschner's deposition shows that he takes full responsibility for all actions of his employees, which would clearly include Jury.  However, this is merely the blanket response of a superior and is indicative of the respondeat superior theory generally.  As a matter of law, this statement alone is an insufficient basis for Daeschner's personal liability in this case.

Plaintiff suggests that Daeschner's liability can be based upon his "prior knowledge of the constitutional violation against Baar and his acquiescence as to it [by] transmitting the Jury reprimand to EPSB."  However, this Court finds no cases which would support individual liability on that basis.[17]  Plaintiff points the Court to *Leary v. Daeschner* ("*Leary I*"), 228 F.3d 729 (6th Cir. 2000), and *Leary v. Daeschner* ("*Leary II*"), 349 F.3d 888 (6th Cir. 2003), as evidence that Daeschner may be held personally liable.  Those cases presented a different circumstance.  There, the question was whether the superintendent could be held liable for an unconstitutional transfer of teachers.  The Sixth Circuit made clear that "[m]erely having the right to control employees is not enough, nor is merely being aware of the misconduct."  *Leary I*, 228 F.3d at 740 (citations omitted).  It found that the superintendent could be liable precisely because he actually was "primarily responsible for approving the transfer of teachers," the allegedly unconstitutional action.  *Id.*  To the contrary, there is neither an allegation nor evidence

_____

[17] While it is true that Daeschner was responsible for transmitting the reprimand to the Education Professional Standards Board ("EPSB"), such transmittal is not the subject of this lawsuit on remand.  Rather, the only unconstitutional act was the reprimand itself.  While it may be contended that his transmittal of the reprimand showed Daeschner's knowledge of the unconstitutional acts and his failure to do anything was the same as knowing acquiescence, such a contention is false.  In *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999), the court found that where a supervisor had knowledge of the allegedly unconstitutional actions and did not act to change them, there was no liability on the part of the supervisor.  "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act."  *Id.* at 300.  Therefore, Daeschner's role in transmitting the reprimand to EPSB does not give rise to personal liability for the reprimand.

suggesting that Daeschner was primarily responsible for giving or approving of the unconstitutional reprimand here.

## VI.

The only remaining substantive issue is the availability of injunctive relief ordering the removal of the ban on Plaintiff's attendance at future LACA meetings. There is little debate about this issue and Defendants have, in fact, already lifted the ban. Given the language of the Sixth Circuit's prior opinion, a further order of this Court is unnecessary.

So as to ensure that all issues are resolved prior to any appeal, the Court also notes that Plaintiff may be a prevailing party in this § 1983 case. Plaintiff successfully litigated the appeal of the case and has secured a favorable alteration of the 2005 Reprimand. If Plaintiff is, in fact, a prevailing party, he may be entitled to an award of attorney fees. The Court will give Plaintiff thirty (30) days to file a motion for such fees. Once fully briefed, the Court will consider attorney fees and issue a final and appealable order.

At this time, the Court will issue an order consistent with this Memorandum Opinion.

cc:     Counsel of Record